AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: _____

# UNITED STATES DISTRICT COURT

### for the

### Western District of Oklahoma

**FILED**

**MAR 2 2 2024**

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIS. OKLA.
BY_____,DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Premises known as 3149 N. Portland Ave., Apt. 103, Oklahoma City, Oklahoma 73112, surrounding curtilage, and any vehicles, garages, and outbuildings thereon | ) ) ) |

Case No.  M-24-251  -STE

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 21 U.S.C. § 841 | Distribution of a Controlled Substance |

The application is based on these facts:

See attached Affidavit of FBI Special Agent, John Krawczyk

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:(_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John Krawczyk, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  3/22/24

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma

SHON T. ERWIN, United States Magistrate Judge
*Printed name and title*

WESTERN DISTRICT OF OKLAHOMA
OKLAHOMA CITY, OKLAHOMA

| | |
|---|---|
| STATE OF OKLAHOMA | ) |
| | ) |
| COUNTY OF OKLAHOMA | ) |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, John Krawczyk, Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, being duly sworn, depose and state as follows:

### INTRODUCTION AND OFFICER BACKGROUND

1.      I have been a Special Agent with the FBI since April 2023.  I am currently assigned to the Oklahoma City Division, where I am assigned to the Criminal Enterprise Squad, which is responsible for investigating street gang and drug related offenses.  Since becoming a Special Agent, I have been involved in a variety of investigative matters, including investigations targeting large criminal enterprises, most of which involved the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Prior to joining the FBI, I was a Police Officer in Philadelphia, Pennsylvania, from February 2010 to December 2022.  In that capacity, I investigated a variety of crimes, including drug crimes, robberies, burglaries, assaults, and various other criminal activities. As part of my drug-related investigations, I have participated in the execution of numerous search and arrest warrants, conducted physical surveillance, coordinated controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs,

1

and spoken with informants, as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

2.    The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure search warrant for Adrian Perez's residence, located at 3149 N Portland Avenue, Apartment 103, Oklahoma City, Oklahoma 73112 (the **SUBJECT RESIDENCE**), as described further in **Attachment A** (physical description), for evidence of violations of 21 U.S.C. § 841(a)(1) (manufacturing, possessing, distributing and selling of controlled substances) and 21 U.S.C. § 846 (drug conspiracy), as described further in **Attachment B** (description of items to be seized).  Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrant.

## BACKGROUND REGARDING DRUG CASES

3.    As discussed previously, based on my training, experience, and consultation with other seasoned drug investigators, I am familiar with the *modus operandi* of drug traffickers.  Based on my training and experience, as well as my participation in numerous drug-related investigations, I know the following:

   a)    I am aware that drug dealers frequently keep assets, records, and documents related to their drug distribution organizations, and monies derived from the sale of illegal drugs, in their own residences, businesses, as well as in safe houses where

2

they are not easily detectable by law enforcement officials conducting investigations. Further, I am aware that these individuals will frequently maintain these houses in the name of other individuals, also to avoid detection by law enforcement agencies;

     b)    I am aware that even though relevant assets, telephones, and properties are often held in alias or third-party names, drug dealers continue to use and exercise dominion and control over them;

     c)    I am aware that drug dealers often maintain on-hand quantities of currency and drugs in order to finance their ongoing drug business;

     d)    I am aware that drug dealers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances, even though such documents may be in code. It is particularly common that individuals engaged in drug trafficking will keep ledgers related to their illegal activity because drug dealers commonly "front" drugs (provide controlled substances on consignment) to their clients, and are frequently "fronted" drugs by their own sources of supply as part of their dealing operations;

     e)    I am aware that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug dealers have ready access to them, i.e., homes, automobiles, businesses and safe houses;

     f)    I am aware that drug dealers will frequently keep records, notes, ledgers, contact lists, and other evidence of their drug trafficking on digital devices (i.e. cellphones, computers, tablets, etc.) and that they often keep such digital devices, particularly cellphones, on their person or on the premises that they control. Further, I

3

am aware that drug dealers will often have multiple digital devices, and will frequently use more than one digital device to help conduct their drug trafficking. I am also aware that drug dealers will use these digital devices to further their drug trafficking through the use of digital communication, including, but not limited to, e-mail, calls, and instant messaging. Further, I am aware that drug dealers will attempt to conceal the information on their digital devices that is relevant to their criminal activities through the use of encrypted applications (i.e. WhatsApp, Signal, Silent Phone) and security locks on their devices;

g)      I am aware that it is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions, drug sources and drug customers, in secure locations within residences, garages, storage building, safes, and safety deposit boxes for ready access, and also to conceal such items from law enforcement agencies;

h)      I am aware that when drug dealers acquire large sums of proceeds from the sale of drugs, they attempt to legitimize their profits;

i)      I am aware that to accomplish these goals, drug dealers utilize, among other things, banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations, and business fronts;

j)      I am aware that drug dealers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the drug dealers organization, even if said items may be in code;

4

k)     I am aware that drug dealers commonly take photographs (or cause photographs to be taken) of themselves, their associates, their property and their products, and that these dealers usually maintain these photographs in their possession and at their residence; and

l)     I am aware that firearms are commonly used by drug dealers to protect their inventory and currency.

## PROBABLE CAUSE

4.     Law enforcement first became aware of Oscar Hernandez (Hernandez) and the drug trafficking organization (the "DTO") described herein in 2018 during an investigation targeting the Irish Mob Gang ("IMG"), an Oklahoma prison gang that was trafficking drugs across the state of Oklahoma and beyond. During the investigation, which utilized Title III wiretaps, law enforcement intercepted Hernandez and identified him as one of the IMG's principal sources of supply of methamphetamine. These IMG members and their associates were ultimately indicted and convicted. *See United States v. Velasquez*, CR-18-260-SLP. Next, from roughly 2019 to 2021, law enforcement began targeting Hernandez's distribution network. During that portion of the investigation ("Phase 1") investigators uncovered a massive methamphetamine distribution network led by Hernandez.

5.     Phase 1 established that Hernandez, who was residing in San Luis Potosi, Mexico, relied on trusted family members and confidants in Oklahoma to conduct the day-to-day operations of the DTO. Those individuals in Oklahoma distributed thousands of pounds of methamphetamine to customers of the DTO and collected millions of dollars in

drug proceeds—all at Hernandez's direction. Prior to that distribution, the crystal meth was converted from its liquid form at multiple clandestine laboratories in rural Oklahoma. While these labs were owned by Hernandez's family members and co-conspirators, the individuals that worked at the labs (hereafter referred to as the "lab workers") appeared to report to the ultimate source of supply, whom cooperators identified as "Mamisan". Law enforcement also found evidence indicating "Mamisan" was the individual responsible for coordinating the shipments of liquid methamphetamine from Mexico to Oklahoma; the investigation established that the methamphetamine was being transported in the gas tanks of a semi-truck, which was owned by and registered to a company called DGC Express. DGC Express, in turn, listed its registered agent as Nelly Gutierrez (Nelly), according to the Texas office of the comptroller. Once the semi-truck arrived in Oklahoma, it was received by the lab workers at a private location, where the liquid methamphetamine could be extracted, placed into transportable containers, and ultimately taken to the clandestine lab location for conversion, after which the crystal meth was returned to Oklahoma City for distribution.

6. As a result of Phase 1 of the investigation, federal charges were filed in the Western District of Oklahoma against more than forty persons, including Hernandez (*see United States v. Hernandez*, CR-21-76-SLP), members of his incarcerated customer base (*see United States v. Baswell*, CR-21-77-SLP), and two truck drivers (*see United States v. Cedillo*, CR-21-288-SLP, *and United States v. Lucio*, CR-21-289-SLP). In addition, law enforcement executed over a dozen search warrants, including at the liquid methamphetamine delivery location and two clandestine labs used by the DTO. Law enforcement also made significant drug and money seizures, including over one thousand

pounds of methamphetamine and more than $1 million in U.S. currency. At the time, this coordinated effort significantly disrupted Hernandez's and the overall DTO's operation. It was not until the fall of 2022, however—with the help of a newly developed confidential human source (CS1)[1]—that law enforcement launched the second phase of the investigation into the DTO described herein (Phase 2).

7.      Since Phase 2 of the investigation launched, law enforcement has identified and dismantled the DTO's meth conversion lab at 980801 S Stage Coach Drive, Wellston, Oklahoma (the "Wellston Property"). On December 8, 2023, the FBI executed a search warrant there, seizing more than 150 gallons of liquid meth and more than 50 lbs. of crystal meth, which appeared based on my training and experience to have been recently converted from liquid form. In addition to these seizures, law enforcement arrested Edgar Rodriguez Ontiveros (RODRIGUEZ) and Jose Equihua (EQUIHUA), the DTO's lab workers at the time, on site. Law enforcement also identified a warehouse, located at 701 SE 29th St., Oklahoma City (the "29th St. warehouse) where the semi-truck was delivering liquid meth

---

[1]      CS1 was arrested by law enforcement for drug related crimes. CS1 thereafter agreed to assist law enforcement and began providing information relating to this investigation in the fall of 2022. Prior to this last arrest, CS1 had been convicted of drug related crimes in 1998 (manufacturing), 2007 (trafficking), and 2021 (possession). CS1 furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending charges. CS1 has also received $1,000 in monetary compensation to date for his/her cooperation. The information provided by CS1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, and telephone analysis. Information provided by CS1 has been reliable and I am unaware of any knowingly false information furnished by CS1. Information attributed to CS1 herein, unless otherwise noted, was obtained by CS1 through his/her personal observations or conversations with targets of this investigation and their associates.

to the DTO. Additionally, during this phase, **Adrian Perez (PEREZ)** (who lives at the **SUBJECT RESIDENCE**) and Ray David Lara (LARA) were identified as key members of the DTO working in and around Oklahoma City.

8.    In the fall of 2023, law enforcement sought authorization to install audio and video recording equipment inside the DTO's liquid meth drop point at the 29th St. warehouse. On September 21, 2023, United States District Judge Jodi W. Dishman for the Western District of Oklahoma, issued two orders—the first authorizing the interception of oral communications inside the 29th St. warehouse, and the second authorizing the monitoring and recording of visual, non-verbal conduct inside the warehouse. The Government's application named LARA, **PEREZ**, and HERNANDEZ as "Target Subjects". Law enforcement monitored activity inside the 29th St. warehouse for a total of 87 days.[2] During that time, law enforcement was able to observe three liquid meth deliveries in real time as they occurred on November 10, November 17, and December 6.

9.    On November 10, 2023, pursuant to the authorization described above, law enforcement was able to record a shipment of liquid meth being delivered to the warehouse in which LARA and **PEREZ** were present. That day, two of the DTO's conversion lab workers, Edgar Rodriguez Ontiveros (RODRIGUEZ) and Jose Equihua (EQUIHUA), were

---

[2]    Law enforcement received two additional bug and/or CCTV authorizations for the 29th St. warehouse after this initial round. First, on October 20, 2023, United States District Judge Scott L. Palk authorized the continued monitoring and recording of visual, non-verbal conduct inside the warehouse. Then, on November 17, 2023, United States District Judge Jodi W. Dishman authorized the renewed interception of oral communications and the continued monitoring and recording of visual, non-verbal conduct inside the same location.

the first to arrive at the warehouse, at approximately 7:18 a.m. Shortly after arriving, RODRIGUEZ appeared to inspect a large, white, intermediate bulk container with metal caging around it (hereinafter, the "IBC tank").

10. Later that day, at approximately 8:15 a.m., EQUIHUA opened the middle garage bay door, and a black semi-truck, with Michael Estrada (ESTRADA) driving, arrived at the warehouse and pulled into the middle garage bay, with the door closing behind it. RODRIGUEZ then moved the IBC tank to a position adjacent to the black semi-truck's passenger-side fuel tank(s). The two lab workers, using two pumps and two sets of hoses, appeared to extract liquid meth from the fuel tank into the IBC tank. The pair finished at approximately 8:32 a.m., and ESTRADA then departed with the black semi-truck. Four minutes later, at approximately 8:36 a.m., LARA arrived at the warehouse driving a white Dodge pickup truck, which was towing a black pull-behind trailer. **PEREZ** also arrived shortly after to the location on foot. For the next hour or so, the two lab workers, LARA, and **PEREZ** worked to load the IBC tank inside the black pull-behind trailer. The group also loaded propane tanks and what appeared to be containers of a chemical substance, such as acetone-both of which I know based on my training and experience are commonly used to convert liquid methamphetamine to crystal form.

11. The lab workers, driving a red pickup truck, ultimately departed the warehouse at approximately 9:54 a.m., and **PEREZ**, driving the white Dodge pickup truck, with the black pull-behind trailer attached, departed shortly thereafter. The pair then arrived in tandem to the Wellston Property—the location that law enforcement would later execute a search warrant at on December 8, 2023, thereby confirming it was the DTO's meth

9

conversion lab. Additionally, a cooperating defendant (CD1)[3] with knowledge of the Wellston Property told law enforcement that PEREZ was involved in the receipt and transport of liquid methamphetamine on behalf of this DTO.

12.     As stated, law enforcement recorded two other liquid-meth deliveries to the 29th St. warehouse. Those deliveries took place on November 17, 2023, and December 6, 2023. For the November 17 delivery, the black semi-truck first traveled to 221 SW 29th St., Oklahoma City, Oklahoma. There, the driver of the semi-truck, ESTRADA, met PEREZ, talking to him briefly, before traveling to the 29th St. warehouse to complete the delivery.

13.     The next morning, the pair of lab workers drove the pull-behind trailer out to the Wellston Property and appeared to work on the conversion process for several days until November 21, 2023—when LARA and **PEREZ** traveled to the area of the Wellston Property in separate vehicles. While the surveillance camera could not capture what LARA and **PEREZ** were doing at the Wellston Property, GPS pings showed they both traveled back to Oklahoma City after they left. Given that law enforcement later confirmed the

---

[3]     CD1 began cooperating with law enforcement in 2023. CD1 has previously been arrested for domestic assault and battery (2015), burglary (2016), assault with a dangerous weapon (2016), and drug trafficking crimes (2023). CD1 has furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending charges. CD1 has not received any monetary compensation to date for his/her cooperation. The information provided by CD1 has been corroborated through other investigative techniques, including physical surveillance, telephone analysis, etc. Information provided by CD1 has been reliable, and I am unaware of any knowingly false information furnished by CD1. Information herein attributed to CD1, unless otherwise noted, was obtained by CD1 through his/her personal observations or conversations with targets of this investigation and their associates.

Wellston Property was a functioning meth lab, I believe they traveled out to the Wellston

Property to obtain crystal methamphetamine, recently converted, for distribution.

14.    Based on regular surveillance in 2023, law enforcement had determined that

**PEREZ** was living at 1402 SW 59th St., Apartment 3206, Oklahoma City.  On February 17,

2024, however, law enforcement observed **PEREZ** move what appeared to be his personal

belongings from that apartment to his truck, with the assistance of Jorge Garcia Vega

(**VEGA**)[4].  It then appeared, again based on surveillance, that **PEREZ** began living at a

different apartment, specifically the **SUBJECT RESIDENCE**.  In fact, since then, **PEREZ**

has been observed on numerous occasions entering the apartment late at night and leaving

in the morning and his vehicle is often observed in the parking lot of the apartment building.

**PEREZ** was observed entering the apartment as recently as March 18, 2024.  It also appears,

based on surveillance, that LARA has visited **PEREZ** at the **SUBJECT RESIDENCE**, and

as recently as March 17, 2024.  Law enforcement believes **PEREZ** is the sole occupant of

the **SUBJECT RESIDENCE**, though it does appear that a female has been observed

entering the apartment with **PEREZ** at night on several occasions and leaving in the

morning.

15.    As stated above, I know based on my training and experience, one's primary

residence, in this case the **SUBJECT RESIDENCE**, is a likely place to find evidence of a

---

[4]    VEGA appears to be a replacement methamphetamine conversion lab worker for
the previously arrested EQUIHUA and RODRIGUEZ. VEGA has adopted a similar pattern
of behavior as the previous lab workers to include residing in a DTO affiliated residence
and frequent trips to the presumed new conversion lab located in Tecumseh, Oklahoma.

drug conspiracy, including cell phones, ledgers, cash proceeds, financial documentation, etc., and I thus believe the **SUBJECT RESIDENCE** will have evidence of **PEREZ's** crimes.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

16.　As described above and in Attachment B, this application seeks permission to search for records that might be found on the **SUBJECT RESIDENCE**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

17.　Probable cause. I submit that if a computer or storage medium is found in the **SUBJECT RESIDENCE**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

      a.　Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

18.  Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT RESIDENCE** because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media can indicate who has used or controlled the computer or storage media. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other

14

evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to

specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

19.     Necessity of seizing or copying entire computers or storage media. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and

who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

17

20.    Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### INFORMATION PERTAINING TO UNLOCKING ELECTRONIC DEVICES WITH BIOMETRIC FEATURES

21.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following.

22.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

23.     If a device is equipped with a fingerprint scanner, a user may enable the ability

to unlock the device through his or her fingerprints. If a device is equipped with a facial

recognition feature, a user may enable the ability to unlock the device through his or her

face. The device can then be unlocked if the camera detects a face with characteristics that

match those of the registered face.

24.     In my training and experience, users of electronic devices often enable the

aforementioned biometric features because they are considered to be a more convenient way

to unlock a device than by entering a numeric or alphanumeric passcode or password.

Moreover, in some instances, biometric features are considered to be a more secure way to

protect a device's contents. This is particularly true when the users of a device are engaged

in criminal activities and thus have a heightened concern about securing the contents of a

device.

25.     As discussed in this affidavit, based on my training and experience I believe

that one or more digital devices will be found during the search. The passcode or password

that would unlock the device(s) subject to search under this warrant is not known to law

enforcement. Thus, law enforcement personnel may not otherwise be able to access the data

contained within the device(s), making the use of biometric features necessary to the

execution of the search authorized by this warrant.

26.     I also know from my training and experience, as well as from information

found in publicly available materials including those published by device manufacturers,

that biometric features will not unlock a device in some circumstances even if such features

are enabled. This can occur when a device has been restarted, inactive, or has not been

19

unlocked for a certain period of time. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

27.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the **SUBJECT RESIDENCE** and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

28.     Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence relating to violations of 21 U.S.C. §§ 841(a) and 846 will be found at the **SUBJECT RESIDENCE**.  I therefore respectfully request issuance of a search warrant

for the **SUBJECT RESIDENCE** (as set forth in Attachment A) based on the above-mentioned facts.

**FUTHER THE AFFIANT SAYETH NOT.**

_____

JOHN KRAWCZYK
Special Agent
Federal Bureau of Investigation (FBI)

Subscribed and sworn to me telephonically this 22nd day of March 2024.

_____

SHON T. ERWIN
United States Magistrate Judge

## Attachment A

## ADDRESS TO BE SEARCHED

3149 N. Portland Ave, Apt. 103 Oklahoma City, OK.









## Description:

The **Subject Property** is located at 3149 N. Portland Ave, Apt. 103, Oklahoma City, Oklahoma 73112. The property is a multi-building apartment complex on the west side of the road in the 3000 blk of N. Portland Ave and has a large sign on the west curbline in front of the complex that says "Portland Parke" and contains the telephone number "405-947-8079". Building 3149 is on the west side of the complex, midway down the west side of the complex. The building has numbers labeled on the northeast corner of the building in plain view that are mounted vertically and are in black numbers "3149". The building has tan vinyl siding with white trim and a black composite roof. The entrance door to apartment 103 faces southwest and is a black door. The number "103" is mounted on the front door in white numbers and can be easily seen.

## **Attachment B**

### **ITEMS TO BE SEIZED**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (manufacturing, distribution, and/or possession with intent to distribute, controlled substances) and 21 U.S.C. § 846 (conspiracy to do the same), namely:

1.  Documents, records, or materials related to the distribution of illegal drugs, including, but not limited to: ledgers, address books, telephone books, telephone bills, telephone records, rent receipts, rental car agreements, mini-storage receipts, cellular telephone agreements, pager rental agreements, bills and receipts related to cellular telephones and pagers, and any property and/or U.S. currency being proceeds of or related to the distribution of illegal narcotics. Also ledgers containing quantity of narcotics possessed, ledgers of money owed to the suspects for narcotics they have provided to co-conspirators, ledgers of money owed by the suspects to their suppliers, transportation and distribution instructions for the narcotics being sold, and other types of documentation regarding the sale of narcotics.

2.  Financial documents evidencing the illegal distribution of controlled substances, including, but not limited to: bank statements, bank deposit slips, canceled checks, money orders, money order receipts, wire transfer receipts, stored value cards, handwritten notes depicting monies owed for illegal controlled substances, documents showing purported income, and any other evidence showing monetary records of the illegal distribution of controlled substances.

3.  Documents, records, or materials related to the laundering of money, including, but not limited to: wire transfer receipts, bank deposit slips, bank withdraw slips, money order receipts, records detailing the purchase of property, items which show control of real property placed in nominee names such as utility payment records, property

1

tax payment records, key to real property, receipts from payment of insurance premiums paid on residences/vehicle.

4. The fruits and proceeds of the illegal distribution of controlled substances, including, but not limited to: large amounts of currency, financial instruments and other items of value showing the spending of large sums of money made from engaging in the illegal distribution of controlled substances, or other illegal activities.

5. Any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

   a. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

      i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

2

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

b. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form,

3

including in digital form on any digital device and any forensic copies thereof.

c.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, cellphones, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

6.  Items which tend to show dominion and control of the property searched, including, but not limited to, utility bills, telephone bills, correspondence, rental agreements, property tax payment records, receipt from the payment of insurance premiums on the residence, and other identification documents.

7.  During the execution of the search of the Subject Residence described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Subject Residence and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.